IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MIKE GROENE, individually and as Chair of the Stop Overspending Nebraska Ballot Committee; ROBERT COLE ROGERS, and AMIE SPRADLEY,<br><br>     Plaintiffs,<br><br>     v.<br><br>COLEEN SENG, in her official capacity as Mayor of the City of Lincoln, Nebraska; THOMAS K. CASADY, in his official capacity as Chief of Police for the City of Lincoln, Nebraska; MIKE FAHEY, in his official capacity as Mayor of the City of Omaha, Nebraska; THOMAS H. WARREN, in his official capacity as Chief of Police for the City of Omaha, Nebraska; JULIE M. HANEY, in her official capacity as Treasurer, Douglas County, Nebraska; RIVKAH SASS, in her official capacity as Library Director for the City of Omaha, Nebraska; STACEY ALDRICH, in her official capacity as Assistant Library Director for the City of Omaha, Nebraska; JAY VAVRICEK, in his official capacity as Mayor of the City of Grand Island, Nebraska; STEVE LAMKEN, in his official capacity as Chief of Police for the City of Grand Island, Nebraska; and STEVE FOSSELMAN, as Library Director for the City of Grand Island, Nebraska,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 4:06cv3153<br><br><br><br><br><br><br><br><br><br>BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER |

## __INTRODUCTION__

Politics ought to be the part-time profession of every citizen who would protect the rights and privileges of free people and who would preserve what is good and fruitful in our national heritage.

Dwight D. Eisenhower, Broadcast speech, January 28, 1954.

1

In Nebraska, at least, President Eisenhower's words have been taken to heart. Nebraska citizens regularly seek to enact legislation or amendments to the State Constitution through initiative petitions. The initiative process represents a form of direct democracy that has been a part of Nebraska's history since 1912, and a part of American political tradition since the founding of the New England colonies in the early 1600's. Since the initiative process is designed to allow the people to act in situations where the legislature refuses, it is perhaps not surprising that the political topics which generate petition drives are often charged with strong emotion and subject to fervent debate. Of course, it is also through the public discussion of issues that ideas are exposed to the light of critical analysis and citizens are able to reach independent conclusions to support or oppose legislation, and act on those choices at the ballot box. The initiative petition process is, no doubt, messy, but it is also a very real portrait of the right to self-governance that forms a bedrock principle of our nation.

In this litigation, Plaintiffs seek the Court's protection of the foundation and framework which allow the initiative process to work: the First Amendment right to engage in discussions of political topics in public places. Through various policies, practices and customs, Defendants have removed petition circulators from public streets, sidewalks, parks and government buildings. Defendants' efforts to limit the size of the audience that initiative petition sponsors and circulators can reach threatens to strangle the viability of the constitutionally protected petition process.

Defendants have violated the First Amendment rights of Plaintiffs and others by imposing bans on petition circulation in traditional public fora. In addition, Defendants have enacted policies which provide unbridled discretion to governmental officials to remove

speakers from publically open governmental facilities with absolutely no objective standards or criteria to assure that these officials exercise their discretion in a content neutral manner.

Plaintiffs are faced with impending deadlines to complete the petition signature process and have no adequate remedy at law. In the absence of the issuance of a temporary restraining order, Defendants' efforts to remove petition circulators from the public square will rob Nebraska voters of the chance to make their own choices and act on those choices on election day.

## **RELEVANT FACTS**

**Stop Overspending Initiative**. The Stop Overspending Nebraska Ballot Committee, and its Chairman Mike Groene, sponsored an initiative petition which seeks to place a constitutional amendment on the Nebraska 2006 ballot. (M.Groene Aff., Ex. 3. ¶¶ 2-3.) The constitutional amendment seeks to establish a limit on the growth of state spending which may only be exceeded with voter approval (the "SOS Initiative"). (Id. ¶ 4; Camera Ready Copy, SOS Initiative Petition, Ex. 1.) In order to be placed on the November 2006 ballot, the SOS Initiative must obtain approximately 117,000 signatures prior to July 7, 2006. (Id. ¶ 5.) The petition drive began on May 9, 2006. (L. Graves Aff., Ex. 4, ¶ 7.)

**The Restricted Access Policy**. On or about June 6, 2006, the Omaha Police Department and Mayor's Office issued a policy with respect to initiative petition circulators entitled "Request to Leave at Private Shopping Areas," but which is also applicable to "publicly-owned property that has a restricted use and is not an open public forum such as outside the City of Omaha libraries or business offices." (Omaha Police Dept. News Release, Ex. 2.) (the "Restricted Access Policy"). As applied to public property, the policy requires that before a petition circulator attempts to gather signatures in front of a publicly-owned property that is not

an open public forum, the petitioner must ask for permission (presumably from the government agency located on the property). (Id.) If permission is denied, the petition circulator must leave. If the petition circulator does not leave and the Omaha Police are called, the "business management,"[1] in the presence of the officer, "will ask the petitioner to leave the premises. If the petitioner refuses the request to leave they [sic] can be arrested for Trespassing or any other appropriate charge." (Id.)

**Omaha Courthouse and Civic Center**. On June 20, 2006, petition circulator Andy Jacobs attempted to collect signatures for the initiative petitions on the sidewalks and public grounds surrounding the Douglas County Government Center which is made up of the Hall of Justice and Omaha/Douglas County Civic Center (collectively referred to as the "Civic Center"). (A. Jacobs Aff., Ex. 8, ¶¶ 15-17.) The Civic Center is made up of two interconnected buildings as well as a surrounding mall which includes sidewalks, courtyards, a fountain and two picnic areas. (Id. at Ex. A.) The complex covers two square blocks of downtown Omaha between 17th and 19th Streets and from Harney to Farnam Street. See, http://www.co.douglas.ne.us/faq.htm. Mr. Jacobs stood in the public mall areas outside of the buildings on both the North and South mall. (Id. at ¶ 15.) Mr. Jacobs remained approximately 20 to 25 feet away from the entrances to the Civic Center. (Id.) In both instances, a security guard approached him and told him that he had to relocate to an area outside of the Civic Center property. (Id. ¶¶ 16-17.)

---

[1]     The Policy language, as written, is directed to private shopping areas and businesses with the caveat that "the Omaha Police Department will follow the same process when the petitioner is on publicly-owned property that has a restricted use and is not an open public forum such as outside the City of Omaha libraries or business offices." (Id.) As a result, the text of the policy does not always neatly harmonize in its application to governmental entities. The policy's reference to "business management" is an example of this.

**Omaha W. Dale Clark Library, Omaha**. Cole Rogers and Mark Pickens attempted to gather signatures outside of the W. Dale Clark Library located in downtown Omaha at 215 South 15th Street. (<u>C. Rogers Aff</u>., Ex. 5 ¶¶ 18-20; <u>M. Pickens Aff</u>., Ex. 9 ¶¶ 13-14.) On June 12, 2006, Mr. Rogers was positioned on a sidewalk/footbridge leading to the 15th Street entrance to the Library. (<u>C.Rogers Aff</u>., Ex. 5 ¶¶ 19-20.) A security officer approached Mr. Rogers and informed him that the library's assistant director did not allow petitioning on the footbridge. (<u>Id</u>. ¶¶ 21-22.) Mr. Rogers entered the library and asked to speak with the library's assistant director. (<u>Id</u>. ¶ 23.) When Mr. Rogers asked the assistant director why he was unable to gather signatures on the sidewalk outside of the library's West entrance, the assistant director told him, "because we don't support your cause."[2] (<u>Id</u>. ¶¶ 24-25.) The assistant director informed Mr. Rogers that if he continued to attempt to gather signatures in that location, he would be arrested. (<u>Id</u>. ¶ 25.)

On June 20, 2006, Mark Pickens attempted to gather signatures on the East side of the library on the public sidewalk that runs parallel with 14th Street and adjacent to the East entrance of the library. (<u>Aff. of M. Pickens</u>, Ex. 9 ¶¶ 13-14.) Mr. Pickens was also approached by a library security guard who informed him that he could not gather signatures on the sidewalk immediately in front of the 14th Street entrance to the library. (<u>Id</u>. ¶ 15.)

**Heartland of America Park, Omaha**. The Heartland of America Park is a 31 acre park located on the riverfront edge of downtown Omaha at 800 Douglas Street. (<u>Aff. of M. Jensen</u>, Ex. 10 at Ex. A.) The park, part of the Omaha Parks and Recreation Department, is made up of a lake with large fountains, boating facilities, walking trails and sidewalks, historic monuments,

---

[2] As stated on the official website of the Nebraska Library Association, the Nebraska Library Association is "part of a coalition, Nebraskans for the Good Life, to fight" the SOS Initiative. (<u>Aff. of M. Jensen</u>, Ex. 10 at Ex. A.) Defendants Sass and Fosselman are members of the Nebraska Library Association.

gardens, picnic areas, shelters and public restrooms.  (Id.)  During the weekend of June 9, 2006, through June 11, 2006, the Heartland of America Park hosted Taste of Omaha, a free community event produced by Mid-American Expositions, Inc., which leased a portion of the park grounds to set up food booths, entertainment stages and playground areas.  (Id.)  On June 9, 2006, Andy Jacobs spent several hours along the public sidewalks and pathways that ran through the park collecting petition signatures.  (Aff. of A.Jacobs, Ex. 8 ¶¶ 8-9.)  Eventually, a private security guard approached Mr. Jacobs and informed him that he could not be in the park during the festival and that if he remained he would be arrested. (Id. ¶¶ 9-13.)

**12th and O Streets, Lincoln**.  12th and O Street is located near the heart of downtown Lincoln.  Between June 9, 2006, and June 11, 2006, O Street to M Street between 11th Street and 13th Street are closed to motor vehicle traffic for the Celebrate Lincoln festival.  (Aff. of M. Jensen, Ex. 10 at Ex. A.)  Celebrate Lincoln is a free community event which celebrates Lincoln's cultural diversity.  (Id.)  The festival includes free concerts, street dances, merchant booths and food and beverage vendors.  (Id.)  Celebrate Lincoln is sponsored by The Updowntowners, a non-profit community organization.  (Id.)  Admission to Celebrate Lincoln is free.  (Id.; Aff of A. Spradley, Ex. 6 ¶ 7.)  Although Celebrate Lincoln occurs within the archetype of a traditional public forum, the festival prohibits "campaign materials, petitions, religious materials, brochures and/or solicitations." (Aff. of M. Jensen, Ex. 10 at Ex. A.)

On June 11, 2006, Amie Spradley tried to enter the Celebrate Lincoln festival on the public streets of Lincoln to gather signatures for the initiative petitions.  (Aff. of A. Spradley, Ex. 6 ¶¶ 5-8.)  When Ms. Spradley attempted to enter the festival, she was informed that petitioners were not allowed at the festival.  (Id. ¶ 9.)  Several Lincoln police officers were standing by the entrance to the festival, when Ms. Spradley told the police officers that she should be allowed

access to the festival because it was being held on the public streets of Lincoln, they refused to allow her to enter the festival. (Id. ¶¶ 10-13.)

**Grand Island Sidewalks**. On June 20, 2006, Cole Rogers attempted to collect petition initiative signatures on the public sidewalk along the exterior of the Edith Abbott Memorial Library in Grand Island, Nebraska. (Aff. of C. Rogers, Ex. 5 ¶¶ 28-30.) Mr. Rogers stood on the sidewalk during normal business hours to ask library patrons entering or leaving the library property to consider signing the initiative petitions. (Id. ¶¶ 5, 28, 30.) Mr. Rogers remained on a public sidewalk used for general pedestrian traffic which ran parallel with 2nd Street on the perimeter of the library grounds. (Id. ¶ 30.) Approximately one hour after his arrival, the library director approached Mr. Rogers and informed him that the director "was not comfortable" with his presence by the library. (Id. ¶ 33.) The director further informed Mr. Rogers that after consulting with the Grand Island City Attorney, the director was empowered to remove Mr. Rogers because he was uncomfortable with Mr. Rogers' presence in front of the library. (Id.)

**Douglas County Treasurer's Offices**. Various petition circulators have sought to gather signatures on the sidewalks in front of the entrances to the Douglas County Treasurer's Offices and Department of Motor Vehicle offices located at 108th and Maple Street, 136th and Q Street, and 84th and Dodge Street, in Omaha, Nebraska. (Aff. of C. Rogers, Ex. 5 ¶¶ 6-17; Aff. of R. Atteberry, Ex. 7 ¶¶ 6-17; Aff. of M. Pickens, Ex. 9 ¶¶ 6-9.) On June 8, 2006, Robert Atteberry attempted to collect signatures on the sidewalk in front of the Douglas County Treasurer's Office at 136th & Q Street, Omaha, Nebraska. (Aff. of R. Atteberry, Ex. 7 ¶¶ 6-7.) The office is located in a strip mall which includes a United States Post Office, a Baker's grocery store, and other retail outlets. (Id. ¶ 8.) Mr. Atteberry was positioned 20 to 25 feet from the entrance to the treasurer's office and approximately two feet from the curb of the parking lot. (Id. ¶ 9.) Mr.

Atteberry was first approached a person who identified himself as the property manager who asked Mr. Atteberry to leave.  (<u>Id</u>. ¶ 11.)  When Mr. Atteberry refused, the property manager called the police and a uniformed police officer then asked Mr. Atteberry to leave.  (<u>Id</u>. ¶¶ 12-14.)  Mr. Atteberry complied with the officer's request. (<u>Id</u>. ¶ 16.)

On June 9, 2006, Mr. Cole Rogers was positioned on the sidewalk outside of the Douglas County Treasurer's office on 108th and Maple Street, Omaha, Nebraska.  (<u>Aff. of C. Rogers</u>, Ex. 5 ¶¶ 6-7.)  The Treasurer's office is located in a strip mall.  (<u>Id</u>. at Ex. A.)  A County employee approached Mr. Rogers and told him that the County Treasurer's office was private property and that he had to leave.  (<u>Id</u>. ¶¶ 9-10.)  The employee then called the police.  (<u>Id</u>. ¶ 10.)  When the police officer arrived, he conferred with the county employee and then spoke to Mr. Rogers.  (<u>Id</u>. ¶¶ 11-12.)  The officer told Mr. Rogers that he could stand in front of one of the other stores in the strip mall, but not in front of the treasurer's office.  (<u>Id</u>. ¶¶ 12-13.)  When Mr. Rogers indicated that this was unacceptable, the officer again conferred with the county employee and then told Mr. Rogers that he could gather petition signatures in the parking lot, but not on the sidewalk.  (<u>Id</u>. ¶¶ 14-17.)

On June 9, 2006, Mark Pickens was collecting petition signatures on the sidewalk outside of the Douglas County Treasurer's office on 84th and Dodge Street, Omaha, Nebraska.  (<u>Aff. of M. Pickens</u>, Ex. 9 ¶¶ 6-8.)  Mr. Pickens was approached by a person who identified himself as a property manager for PJ Morgan.  (<u>Id</u>. ¶¶ 8-9.)  The property manager informed Mr. Pickens that the Treasurer's office was located on private property and that he could not seek signatures on the property.  (<u>Id</u>.)  Mr. Pickens then left. (<u>Id</u>.)

**The Effect of Defendants' Actions**.  As a result of the policies and practices of Defendants in their respective cities, the SOS Initiative may not receive the requisite number of

signatures to be placed on the Nebraska November 2006 ballot.  (<u>M. Groene Aff.</u>, Ex. 3, ¶ 8.)

Indeed, prior to Omaha's institution of its current policy, petitioners obtained approximately 67

signatures per petition circulator.  (<u>L. Graves Aff.</u>, Ex. 4, ¶ 13.)  For the period directly after

Omaha instituted its current Restricted Access Policy, from June 7, 2006 until June 15, 2006,

signatures per petitioner have declined to approximately 58.  (<u>Id.</u> ¶ 13-14.)  This unusual decline

in the number of signatures per petitioner is a direct result of the policies and practices of

Defendants in their respective cities, and has forced the petition drive management company to

both increase the number of petitioners and the amount of money paid per signature.  (<u>Id.</u> ¶¶ 15-

19.)  Defendants' policies and practices have also significantly increased the cost of the SOS

Initiative petition drive because managers have been forced to recruit and train numerous

additional petition circulators.  (<u>Id.</u> ¶ 21.)

## **ARGUMENT**

A temporary restraining order enjoining the enforcement of Defendants' official policies,

practices and customs should be issued if the Court finds that (a) Plaintiffs suffer a threat of

irreparable harm; (b) the balance between the harm to Plaintiffs and the harm created by granting

the injunction weighs in favor of issuing an injunction; (c) Plaintiffs are likely to succeed on the

merits of the litigation; and (d) the public interest supports the issuance of the injunction.

<u>Dataphase Systems, Inc. v. C L Systems, Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  <u>See</u>

<u>also Davis v. Francis Howell Sch. Dist.</u>, 104 F.3d 204 (8th Cir. 1997).

Plaintiffs satisfy each element of the <u>Dataphase</u> test as to each of the constitutional

claims.  Therefore, Plaintiffs are entitled to a temporary restraining order.

## I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF IMMEDIATE INJUNCTIVE RELIEF IS NOT GRANTED.

A violation of a constitutional right constitutes irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373-74 (1976).

## II. THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER PREVENTS IRREPARABLE HARM TO PLAINTIFFS THAT OUTWEIGH ANY POTENTIAL HARM TO DEFENDANTS.

In order for a temporary restraining order to issue, the Court must find that the potential harm to Defendants from issuance of the temporary restraining order "does not outweigh the possible harm to the Plaintiffs if such relief is denied." Dataphase, 640 F.2d at 113. As discussed in section III of this brief, the official policies, practices and customs of Defendants which limit petition circulators' rights to access in public areas are unconstitutional in several respects. Thus, enforcement of the statutes will result in the violation of Plaintiffs' constitutional rights.

The potential harm to Defendants from issuing the restraining order is minimal. Defendants' interests would not be significantly affected by the issuance of the temporary restraining order because such an order would merely allow petition circulators access to governmental property that the public is already allowed to enter.

**III.** **PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

    **A.** **Nebraska Citizens Have a Constitutional Right to Enact Legislation and Amend the State Constitution Through the Initiative Petition Process.**

The peoples' right to pursue political change through the initiative petition process is a fundamental aspect of Nebraska law. As the Nebraska Supreme Court recognized in <u>Duggan v. Beermann</u>, 249 Neb. 411, 544 N.W.2d 68 (1996), courts must "respect and . . . give effect to the power the people have reserved to themselves to amend the Nebraska Constitution through initiative measures." <u>Id</u>. at 421, 544 N.W.2d at 75. Indeed, under the Nebraska Constitution, the very first right reserved to the people is "the power to propose laws, and amendments to the constitution, and to enact or reject the same at polls, independent of the Legislature. . . ." Neb. Const. art. III, § 1. This power is "invoked by petition wherein the proposed measure shall be set forth at length." <u>Id</u>., art. III, § 2. The drafters of Nebraska's Constitution made this right "self executing" and limited the legislature's authority to pass laws that would hamper the peoples' right to legislate via initiative petitions. <u>Id</u>., art. III, § 4; <u>Bernbeck v. Moore</u>, 936 F. Supp. 1543, 1560 (D. Neb. 1996) aff'd 126 F.3d 1114 (8th Cir. 1997) (the Unicameral "has the power only to 'facilitate,' not limit" the right of petition.)

Through the initiative petition process, Nebraska citizens act as a separate legislative body authorized to take action when or if the Unicameral fails to act or, in the peoples' view, acts inappropriately. <u>See</u>, David B. Magleby, <u>Direct Legislation Voting on Ballot Propositions in the United States</u> 35 (1984) (The initiative is "the means by which voters can correct legislative sins of omission and the popular referendum as the means of correcting legislative

sins of commission.")  Thus, the peoples' right[3] to enact law through petition is separate from, but equal to the Unicameral's right to pass legislation.  See generally, P.K. Jameson and Marsha Hosack, Citizen Initiatives in Florida:  An Analysis of Florida's Constitutional Initiative Process, Issues, and Alternatives, 23 Fla. St. U. L. Rev. 417, 418 (1995) ("Initiatives generally allow the public to bypass the legislature and reserve direct lawmaking power in the voters of the state.")  Nebraska citizens have a legally recognized right and the constitutional authority to amend the laws of the State through the initiative process, and the government is precluded from hindering the citizens' ability to exercise this power.[4]

---

[3]     Though the peoples' right to enact legislative or constitutional amendments through initiative petition is clear, the process is not easy.  Groups seeking to place measures on the ballot through initiative petitions must generally hire paid petition circulators because "[t]he numbers (of signatures needed) are so great, the time is so short and people don't do anything for free anymore."  N. Jenkins, Interactions Getting Contentious Between Petition Parties, Lincoln Journal Star, June 25, 2006 (available online at http://www.journalstar.com/articles/2006/06/25/ local/doc449dd4ba55ad0070205689.txt).  A reporter who tried circulating petitions in California wrote: "I must have made 10 attempts without a strike [signature]. And with each failure, the more tentative I grew."  Howe, Big Money Swamps the Ballot, San Francisco Chronicle, May 19, 1998.  Circulating petitions is "work . . . time-consuming and it is tiresome – so much so that it seems that few but the young have the strength, the ardor, and the stamina to engage in it, unless, of course, there is some remuneration."  Meyer v. Grant, 486 U.S. 414, 423-24 (1988).  Nor is the initiative petition process inexpensive.  See Duggan, 249 Neb. at 418, 544 N.W.2d at 73 (noting that $205,000 was raised to fund an initiative petition seeking term limits on Nebraska elected officials).

[4]  This limit on a state government's ability to hinder the initiative petition process was created, at least in part, in an effort to thwart the potential for governmental abuse:

> At the beginning of the agitation for this reform, there was a popular belief among the people that by the strictly representative plan of expressing the popular will, the people were too frequently misrepresented and often betrayed.  Indeed, so intense was this feeling that there arose a common cry that representative government was a failure.  There was, without dispute, much to justify this feeling.  Senatorial elections by the Legislature in many instances had become a national disgrace.  Refusal to enact laws repeatedly demanded by the people through their party platforms and otherwise, instilled the belief that corruption was rife and that legislators were subject to the influence of privileged interests. The refusal of Legislatures to submit constitutional amendments, popularly

**B.**     **Gathering Signatures for Initiative Petitions is Core Political Speech Protected by the First Amendment and the Nebraska Constitution**.

The United States Supreme Court clearly explained that the gathering of signatures for initiative petitions is core political speech subject to the full protection of the First Amendment in two recent cases.[5]  In <u>Meyer v. Grant</u>, 486 U.S. 414 (1988), the Court unanimously struck down a Colorado statute that made it a crime to pay or receive money for circulating initiative petitions.  In <u>Buckley v. American Constitutional Law Found.</u>, 525 U.S. 182 (1999), the Court found unconstitutional a statutory scheme which required initiative petition signature gatherers to be registered voters and wear identification badges, and required proponents of an initiative to report the names and addresses of all paid circulators and the amount paid to each circulator.  In both <u>Meyer</u> and <u>Buckley</u>, the Court explained that citizens seeking signatures for an initiative petition were engaged in core political speech:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.  Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate.  This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it.  Thus, the circulation of a petition

---

> demanded, which in most cases required a two-thirds vote in each house of the assembly, added to the feeling of wrong and injustice.

<u>Van Kleek v. Ramer</u>, 62 Colo. 4, 24, 156 P. 1108, 1115 (1916) (Justice Scott, dissenting).

[5]  Both cases arose from Colorado which has a State Constitutional initiative petition provision which is similar to Nebraska's. The Colorado Constitution acknowledges the seminal principal that all political power derives from the People.   Under it, the People expressly reserve to themselves the power to propose laws and amendments through the initiative and referendum processes: "[T]he people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly. . . ." Colo. Const. art.  V, sec. 1(1).

involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'

Meyer, 486 U.S. at 421; see also, Buckley, 525 U.S. at 199; see also, Bernbeck v. Moore, 936 F. Supp. 1543, 1561 (D. Neb. 1996) aff'd 126 F.3d 1114 (8th Cir. 1997) (circulation of an initiative petition pursuant to Nebraska law "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'") (internal citations omitted).

Though the issues addressed in Meyer, Buckley and Bernbeck involved the qualifications of those who could circulate initiative petitions and this litigation involves petition circulators' access to property, for First Amendment purposes the Constitutional quality of the speech remains the same. Plaintiffs seek access to streets, sidewalks and exterior areas of various types of public property. Plaintiffs seek this access so that they can engage others in dialogue and seek signatures in support of petitions to amend the Nebraska Constitution. The Stop Overspending Initiative would place a cap on State spending which could not be exceeded without voter approval. Like the plaintiffs in Meyer, who sought to place trucking deregulation on the ballot, the plaintiffs in Buckley, who sought to legalize hemp, and the plaintiffs in Bernbeck, who sought to implement term limits on Nebraska's elected officials, Plaintiffs in this case must engage in dialogue with their fellow citizens in an effort to persuade Nebraska voters to place important issues of public concern on the election ballot. Plaintiffs must explain the purposes of the initiatives, attempt to persuade listeners to support the initiatives and request that listeners sign the petitions to subject the initiatives to voter approval. As the Supreme Court and this Court have previously determined, this type of communicative activity is "core political speech"

14

for which the protections of the First Amendment are "at its zenith." <u>Buckley</u>, 525 U.S. at 187; <u>Meyer</u>, 486 U.S. at 425; <u>Bernbeck</u>, 936 F. Supp. at 1558.

In addition, the effect on core political speech is the same under both the circulator qualification statutes at issue in <u>Meyer</u> and <u>Bernbeck</u>, and the circulator access issues presented in this case. In striking down the statutory provisions which limited the number of circulators eligible to obtain petition signatures, the <u>Meyer</u> Court explained that such provisions unconstitutionally restrict political speech in two ways: "First, it limits the number of voices who will convey [the sponsor's] message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that [the sponsor] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." <u>Meyer</u>, 486 U.S. at 422-23. Thus, in <u>Meyer</u> and <u>Buckley</u> the circulator qualification statutes had the indirect effect of limiting the size of the audience which petition circulators could reach (by limiting the number of qualified circulators). In the present case, the restrictions on access to governmental property has the direct effect of limiting the size of the audience by removing circulators from a number of publically open locations where people generally gather. Just as in <u>Meyer</u> and <u>Buckley</u>, such a restriction "limits the size of the audience" petitioners can reach and makes it less likely that circulators will gather the number of signatures necessary to make the issue a focus of statewide debate. As a result, the limited access provisions impose a "severe burden" on "core political speech." <u>Buckley</u>, 525 U.S. at 192 n.12.

**C.** **Defendants Policies, Practices and Customs Limit Core Political Speech in Traditional Public Fora.**

The fact that petition circulators are engaged in core political speech "merely begins [the] inquiry" where, as here, they seek access to government property. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799 (1985); Initiative and Referendum Institute v. United States Postal Service, 417 F.3d 1299, 1305 (D.C. Cir. 2005) (finding that circulating initiative petition is protected speech and engaging in forum analysis of right to gather petition signatures on postal service sidewalks). The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Id. at 800; Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006). Under this analysis, "the extent to which the Government can control access depends on the nature of the relevant forum." Id. "The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum" and the "extent to which access to, and the character of speech upon, government property may be limited depends upon the nature of the forum in which the speech takes place." Bowman, 444 F.3d at 974-75.

**Traditional Public Fora**. Traditional public fora are "'public places' historically associated with the free exercise of expressive activities." United States v. Grace, 461 U.S. 171, 177 (1983). The archetype of traditional public fora are sidewalks, streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." Hague v. CIO, 307 U.S. 496, 515

(1939). "'[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.'" Hudgens v. NLRB, 424 U.S. 507, 515 (1976).

The definition of a traditional public forum is based, in large part, on the historic and traditional character of the property at issue. In Grace, for example, the Court held that the perimeter sidewalks surrounding the Supreme Court building, though within the Supreme Court grounds proper, remained a traditional public forum. Grace, 461 U.S. at 183. Similarly, the Court held that the publicly accessible areas surrounding foreign embassies located on United States soil were traditional public fora. Boos v. Barry, 485 U.S. 312, 334 (1988). In Forsyth County v. The Nationalist Movement, 505 U.S. 123 (1992), the Court addressed the application of a county's assembly and parade ordinance to a proposed rally "on the courthouse steps." Id. at 127. Though the Court struck the ordinance as facially invalid, it first noted that the regulation operated in "a traditional public forum" Id. at 130.

In Edwards v. South Carolina, 372 U.S. 229 (1963), a case arising prior to the development of the Court's current forum analysis, the Court suggested that the grounds of a state capitol building were the equivalent of what is now referred to as a traditional public forum. In Edwards, a group of high school and college students gathered at the South Carolina State House grounds, an area of two city blocks open to the general public. Id. at 230. The State House Grounds were occupied by the Executive Branch, Legislative Branch and Judicial Branch of South Carolina's state government. Id. at 236 n. 10. Far from holding that the State House grounds were a nonpublic area the students should have been denied access to, the Court found that the students' actions were "an exercise of . . . basic constitutional rights in their most

pristine and classic form. The petitioners felt aggrieved by laws of South Carolina which allegedly 'prohibited Negro privileges in this State.' They peaceably assembled at the site of the State Government and there peaceably expressed their grievances 'to the citizens of South Carolina, along with the Legislative Bodies of South Carolina." Id. at 236.

Similarly, in Brown v. Louisiana, 383 U.S. 131 (1966), another case arising prior to the Court's current forum analysis, the Court held that the First Amendment protected a peaceful and silent sit-in at a segregated public library. Id. at 141. "[T]he First and Fourteenth Amendments guarantee[ of] freedom of speech and of assembly, and freedom to petition the Government for a redress of grievances. . . . embrace[s] appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be, the unconstitutional segregation of public [library] facilities." Id.

The touchstone for determining whether a particular property is a traditional public forum turns on whether the property "has the physical characteristics of a public thoroughfare . . . the objective use and purpose of open public access[,] or some other objective use and purpose inherently compatible with expressive conduct." Bowman, 444 F.3d at 975. To determine whether a particular place is a traditional public forum, a court must consider the unique characteristics, objective use, and purposes of the property as well as any historical and traditional expressive purposes served by the property.

In a traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'"

Grace, 461 U.S. at 177 (citations omitted) (quoting Perry Education Ass'n, 460 U.S. at 45). Content based restrictions on speech imposed in a traditional public forum must serve a compelling government interest and be narrowly tailored to that end by utilizing the least restrictive means needed to satisfy the governmental objective. See Sable Communications of California, Inc. v. F.C.C., 492 U.S. 115, 125 (1989); Boos v. Barry, 485 U.S. 312, 321 (1988).

**Libraries**.  Petition circulators have been denied access to the public sidewalks which surround the W. Dale Clark Library in Omaha and the Edith Abbott Memorial Library in Grand Island.  The Court need not reach the question of whether these buildings and their interior sidewalks are traditional public fora in order to determine that the denial of access to the circulators on the perimeter sidewalks of the facilities constitutes a violation of the First Amendment.  The Court addressed this precise situation in Grace, where Congress enacted a statute which prohibited the display of any communicative flag, banner or device in the United States Supreme Court building or on its grounds.  Grace, 461 U.S. at 172-73.  Without deciding whether the Supreme Court building and grounds were a public forum, the Court invalidated the statute because it extended to the exterior sidewalks surrounding the perimeter of the grounds "as well as the building and grounds inside the sidewalks." Id. at 178-79.  "Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression. Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property. The public sidewalks forming the perimeter of the Supreme Court grounds, in our view, are public forums and should be treated as such for First Amendment purposes." Id. at 180.

Like the sidewalks surrounding the perimeter of the Supreme Court grounds, the sidewalks which run along the exterior grounds of the Edith Abbott Memorial Library and W. Dale Clark library are virtually indistinguishable from any of the other public sidewalks in Grand Island or Omaha. The sidewalks do not lose their "historically recognized character" merely because they abut government property which may not be a traditional public forum. "[S]treets, sidewalks, and parks, are considered, without more, to be 'public forums.'" Grace, 461 U.S. at 177.

Since Defendants actions in removing the petition circulators from the library sidewalks adversely impacted core political speech in traditional public fora, whether the Court finds that petitioners' speech was silenced due to the content of their speech (so that strict scrutiny applies), or that defendants' attempted to impose a content-neutral time place or manner restriction (which must be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels of communication), the removal of petitioners violated the First Amendment. Compare Boos, 485 U.S. at 321 (holding that content based restriction on speech in traditional public forum is subject to exacting scrutiny which requires that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn[6] to achieve that end."), with Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989) (content-neutral time, place or manner restrictions on speech a traditional public forum must be "justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a

---

[6]    When dealing with content based (as opposed to content-neutral) restrictions on speech, the Court has held that a regulation is "narrowly drawn" or "narrowly tailored" only if it is "the least restrictive means" of accomplishing the government's objective. See Sable Communications of California, Inc. v. F.C.C., 492 U.S. 115, 125 (1989).

significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'")

Assuming that the removal of petition circulators from the library sidewalks constitutes a content-neutral restriction on speech in traditional public fora,[7] government action must be narrowly tailored to serve a significant state interest. <u>Ward</u>, 491 U.S. at 798. To be narrowly tailored in this context, a regulation "need not be the least restrictive or least intrusive means" of serving the government's interests. <u>Id</u>. Nonetheless, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." <u>Id</u>. at 799. A content-neutral restriction on speech in a traditional public forum "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy. A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." <u>Frisby v. Schultz</u>, 487 U.S. 474, 485 (1988) (addressing content-neutral restriction on picketing in traditional public forum). While Omaha and Grand Island have a significant state interest in maintaining clear access to its public buildings, controlling pedestrian traffic on the sidewalks and preventing disturbances, it is not necessary to remove all

---

[7]    The assumption of content-neutrality is, in fact, called into question by the rationale for removal in both Omaha and Grand Island. The Omaha assistant library director indicated that petitioners were unwelcome at the W. Dale Clark library because "we don't support your cause," and the director of the Grand Island library indicated that he was "uncomfortable" with petitioners due to "citizen requests." When the government imposes a restriction upon speech because it disagrees with the message a speaker wishes to convey, the regulation is content-based. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989). A regulation which attempts to regulate speech or expressive conduct because of its direct emotional impact on listeners or viewers is also content-based. <u>Boos v. Barry</u>, 485 U.S. 312. "Regulations that focus on the direct impact of speech on its audience" are properly analyzed under content-based standards. <u>Id</u>. at 321. In any case, the removal of petition circulators from the library sidewalks violates the First Amendment even under the less rigorous scrutiny applied to content-neutral regulations of speech.

petition circulators from the sidewalks to achieve these interests. The cities could enact legitimate time, place and manner restrictions which limit the number of circulators in a given area, require that circulators allow pedestrians to freely pass on the sidewalk, or otherwise require that city sidewalks remain passable so that library patrons retain easy access to government facilities. However, a total ban on all petition circulators targets and eliminates far more than any legitimate "evil" the cities can raise to justify this proscription. See Grace, 461 U.S. 182 ("We do not denigrate the necessity to protect persons and property or to maintain proper order and decorum within the Supreme Court grounds, but we do question whether a total ban on carrying a flag, banner or device on the public sidewalks substantially serves these purposes.")

**Public Festivals in Parks and Streets**. Petition circulators have also been removed from a public park in Omaha and from the city streets in Lincoln. Like the sidewalks surrounding the Omaha and Grand Island libraries, city streets and parks are traditional public fora to which the circulators have a right of access. "At the heart of our jurisprudence lies the principle that in a free nation citizens must have the right to gather and speak with other persons in public places." ISKCON v. Lee, 505 U.S. 672, 696 (1992) (Kennedy, J., joined in pertinent part by Blackmun, Stevens and Souter, JJ., concurring in judgment); see also Grace, 461 U.S. at 177 ("[S]treets, sidewalks, and parks, are considered, without more, to be 'public forums.'") Petition circulators attended the Taste of Omaha event at Heartland of America Park and despite the fact that this free, community wide event was open to the public, were told that they could not seek petition signatures in the public park during the event. Similarly, petition circulators attended the Celebrate Lincoln festival, a free, community wide event open to the public and

held on the downtown streets of Lincoln, and were told that they could not seek petition signatures on the city streets or sidewalks during the event.

Since "[t]raditional public fora are defined by the objective characteristics of the property," the state "may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums." Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998); United States Postal Serv. v. Council of Greenburgh Civic Ass'ns., 453 U.S. 114, 133 (1981). Even where a city temporarily leases a public park or street to a private permittee for a special event, if entrance to the street or park remains free and open to the public, the property retains its character as a traditional public forum. Parks v. City of Columbus, 395 F.3d 643, 650 n.5, 652 (6th Cir. 2005) (street preacher could not be evicted from art festival because private organizers found preachers message odious. City cannot transform a traditional public forum into a non-public forum by leasing to private entity simply because it so desires. "The City cannot . . . claim that one's constitutionally protected rights disappear [where] a private party is hosting an event that remain[s] free and open to the public."); Gathright v. City of Portland, Or., 439 F.3d 573, (9th Cir. 2006) (rejecting city's policy of allowing private permittees to exclude speakers from a public forum as a violation of the First Amendment where a speaker in a public forum seeks only to be heard, not to have his speech included or possibly confused with another's).

Petition circulators did not seek access to Taste of Omaha or Celebrate Lincoln in order to compete with the organizers' message or convey a counter point of view. Although it is questionable whether the organizers of these events were attempting to convey any particularized message, even if they were, the petitioners sought only the same access to the events as was provided to the general public. The events were free, held in a city park or street,

and were open to anyone who wished to attend. Yet, when petition circulators sought to enter the festivals, they were denied access because they intended to exercise First Amendment rights that were otherwise within the type of communication traditionally allowed in these fora. This denial of access based upon the petitioner's intent to engage in core political speech is a clear violation of the First Amendment.

Because Omaha and Lincoln officials infringed upon the circulators' core political speech in traditional public fora, Defendants' actions must at least[8] be narrowly tailored to serve significant government interests and leave open ample alternative means of communication. Ward, 491 U.S. at 798. Just as Defendants cannot justify completely removing all petition circulators from the public sidewalks surrounding libraries, Defendants cannot justify a complete ban on circulators at festivals held in public parks or city streets. Importantly, the circulators' attempts to gain access to public festivals to obtain petition signatures is fundamentally distinct from speakers who attempt to intrude upon an otherwise private festival held in a public location for the purpose of quashing or interfering with the private festival's message. See Parks, 395 F.3d at 651 (noting that different results reached when permittee holds private, invitation-only event on public property and others seek access for the purpose of disagreeing with permittee's message); accord Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995) (requiring a parade-organizer to include a message in the parade that the organizer did not want to convey would violate the organizer's freedom of speech). Defendants have no significant governmental interest which requires a complete ban of all petition circulators from the public streets of Lincoln or the public parks of Omaha.

---

[8] This assumes the defendants actions are content-neutral, so that strict scrutiny does not apply.

**Douglas County Hall of Justice and Civic Center**.  Petition circulators sought access to the sidewalks and mall areas of the Douglas County Hall of Justice and Civic Center (the "Civic Center") to gather petition signatures.  Although the circulators remained at least 20 to 25 feet away from any entrances or exits, the circulators were denied access to the property.  The public sidewalks, thoroughfares and malls of the Civic Center are a traditional public forum.  Like the courthouse steps in Forsyth County, and the State Capitol grounds in Edwards, the Civic Center, as the main complex of city and county government in Douglas County, possesses historic and traditional qualities of being "devoted to assembly and debate." Perry Ed. Assn., 460 U.S. at 45. While it is certainly true that "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will," Grace, 461 U.S. 178, the Civic Center is closely akin to the courthouse steps in Forsyth and the State House grounds in Edwards.

The proposed rally in Forsyth was to occur on the exterior grounds of the County Courthouse, just as the petition circulators seek access to the exterior grounds of the Civic Center.  The Civic center serves as the seat of executive, legislative and judicial branches of government, just like the South Carolina State House grounds in Edwards served as the seat of executive, legislative and judicial branches of government.  Edwards, 372 U.S. at 236 n.10. Both the Civic Center and the South Carolina State House grounds cover a two block area.  Id. at 230.  Further, a historical basis exists to find that the Civic Center grounds have traditionally been a place of citizen assembly and debate.  In 1859, a group of citizens lynched suspected horse thieves and laid their bodies on the courthouse steps as a message to other would-be criminals.  L. Lee, Andreas' History of the State of Nebraska § 1, Lynch Law.[9]  In 1866, the First

---

[9] Available at www.kancoll.org/books/andreas_ne/douglas/douglas-p6.html#lynch.

Baptist Church regularly met in the courthouse hall to hold services. Id. § 10.[10] Shamefully, on September 25, 1919, more than 4,000 white citizens gathered at the Douglas County courthouse seeking vigilante justice against Will Brown, an African American man who stood accused of assaulting a young white girl. Frederick Luebke, An Illustrated History of Nebraska 245-49 (1995). On a broader scale, Nebraska has a historical tradition of utilizing government buildings as points of public assembly and protest. In February of 1933, the Farm Holiday Association organized a large, but well behaved, assembly of farmers who met on the State Capitol steps and successfully demanded that the legislature enact a two-year moratorium on all mortgage foreclosures.

Just as the Edwards plaintiffs' assembly at the South Carolina State House grounds was "an exercise of . . . basic constitutional rights in their most pristine and classic form," and just as The Nationalist Movement's planned rally on the courthouse steps in Forsyth County involved a traditional public forum, petitioners' attempts to engage citizens in dialogue on political issues on the open grounds of the Civic Center is a basic exercise of First Amendment rights in a traditional public forum with a history and tradition of serving as a location for assembly and debate. As with each of the other burdens upon speech in traditional public fora discussed previously, the city and county's removal of petitioners from the Civic Center was not narrowly tailored to serve a significant governmental interest.

---

[10] Available at www.kancoll.org/books/andreas_ne/douglas/douglas-p15.html.

**D.  Defendants' Policies, Practices and Customs Grant Unbridled Discretion to Governmental Officials to Limit Core Political Speech in Designated Public Fora**.

Not all government property open to the public is a traditional public forum.  A designated public forum is "a nonpublic forum the government intentionally opens to expressive activity for a limited purpose."  Bowman, 444 F.3d at 975.  As explained by the Court in Perry, a "public forum may be created for a limited purpose such as use by certain groups, e.g., Widmar v. Vincent, 454 U.S. 263 (1981) (student groups), or for the discussion of certain subjects, e.g., City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n, 429 U.S. 167 (1976) (school board business)."  Perry, 460 U.S. at 46 n.7 (full internal citations omitted).  Designated public fora may be either unlimited, in which case the speech standards applicable to traditional public fora apply, or limited, in which case "restrictions on speech not within the type of expression allowed in [the limited forum must] . . . be reasonable and viewpoint neutral."  Bowman, 444 F.3d at 976.

The joint Douglas County Treasurer's Offices and Department of Motor Vehicle facilities are examples of designated public fora.  Though not traditional public fora in the sense of streets, sidewalks or parks, these locations are public property that the government has opened for certain types of expressive activity.  One may go to these offices to register to vote, register a motor vehicle, obtain license plates, seek a medically required handicap parking permit or obtain a driver's license.  Citizens certainly have the right to visit the county treasurer's office to voice their satisfaction, or more likely dissatisfaction, with property tax valuations or the amount of the tax levy.   Additionally, Douglas County allows the presence of newsracks on sidewalks immediately in front of the entrances to some of these locations.  Yet, these fora have not been opened for all manner of expressive activity on any topic.

27

When petition circulators sought to collect petition signatures on the sidewalks in front of the joint offices, either property managers or county employees informed them that they were not allowed to do so.[11] Each of these offices had a copy of the Restricted Access Policy posted on the front door of the facility.

Even assuming these properties are privately owned and only leased by Douglas County, that does not affect their status as public property subject to a forum analysis. Under Nebraska law, "a tenant is entitled to the exclusive possession and use of the demised premises and may even maintain trespass against his landlord" during the term of the lease. Peterson v. Vak, 160 Neb. 450, 456 (1955). Thus, as a matter of state real estate law, Douglas County is the entity entitled to possession and control of the leased property during the term of the lease.

Additionally, the Supreme Court has previously held that when a city leases private property for a public use, the speech restrictions that can be imposed on the property are subject to a fora analysis under the First Amendment. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975). In Conrad, a production company sought the use of the Tivoli, a privately owned Chattanooga theater leased by the city, to present the musical "Hair." Id. at 546. When the city denied Southeastern's request as not being in the "best interests of the City," Southeastern brought suit alleging a violation of the First Amendment. In analyzing Southeastern's claim, the Court held that despite the Tivoli's status as a privately owned theater only under lease to the city, it was a "public forum[] designed for and dedicated to expressive activities." Id. at 555.

_____

[11] The joint offices located on 136th and Q streets and 108th and Maple streets in Omaha are in strip malls. The office located just off of 84th and Dodge street in Omaha is a stand alone facility. Each of these locations is identified as a Douglas County Treasurer's office at http://www.dctreasurer.org/Locats.htm. All, apparently, are leased by the county.

Pursuant to the Restricted Access Policy, when petition circulators seek to obtain signatures in front of a Douglas County Treasurer's office, the circulator is first required to request permission from the Treasurer's office prior to attempting to obtain signatures.  If the circulator fails to get permission and "management" asks the circulator to leave, the circulator "should obey the request to leave."  If the Omaha police are called to intervene, in the presence of the police officer management will request that the circulator leave and if the circulator refuses to leave, the circulator may be arrested.  Thus, according to the Restricted Access Policy, county employees or property managers have unfettered discretion to either allow circulators to stay, relocate them to a different area, or force the circulators to leave the property entirely.

In order to protect speakers from covert forms of content based discrimination, the Supreme Court has routinely required that permission and licensing schemes be constructed with objective and definite standards to reduce the possibility of arbitrary administration.  The Court has routinely invalidated permit and licensing schemes which vest too much discretion in city officials or agents.  See e.g., Conrad, 420 U.S. at 552-53; Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); Cox v. Louisiana, 379 U.S. 536 (1965); Lovell v. Griffin, 303 U.S. 444 (1938) (holding ordinance which prohibited the distribution of literature without a permit from the City Manager invalid on its face as a prior restraint).

In Conrad, the Court determined that the City's requirement that production groups request the City's permission prior to obtaining access to a theater leased by the City was the equivalent of a permit or licensing scheme.  Conrad, 420 U.S. at 554.  The Court found the permission requirement to be identical to the permit and licensing requirements that it had previously ruled to be prior restraints.

In these cases, the plaintiffs asked the courts to provide relief where public officials had forbidden the plaintiffs the use of public places to say what they wanted to say. The restraints took a variety of forms, with officials exercising control over different kinds of public places under the authority of particular statutes. All, however, had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.

Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards. The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use. Our distaste for censorship-reflecting the natural distaste of a free people-is deep-written in our law.

Id. at 553.

The Restricted Access Policy confers wholly discretionary authority upon city and county officials to expel any unwanted speakers from the public areas adjacent to city or county property. "A restriction on speech is constitutional only if certain principles are adhered to. Among these principles is a requirement that the restriction be specific enough that it does not delegate unbridled discretion to the government officials entrusted to enforce the regulation." Lewis v. Wilson, 253 F.3d 1077, 1079 (8th Cir. 2001). In Lewis, an applicant requested, and was denied, a vanity plate reading "ARYAN-1." The Eighth Circuit held that even if license plates could be characterized as a nonpublic fora, a state regulation which allows the department of motor vehicles to "refuse to issue license plates that are 'contrary to public policy'" violates the First Amendment because the regulation vests unfettered discretion in governmental officials. Id. at 1079-80.

> It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not . . . by use of a statute providing a system of broad discretionary licensing power. Where a regulation requires that a speaker receive permission to engage in speech, the official charged with granting the permission must be provided specific standards on which to base his or her decisions. Without such standards, every application of the regulation "creates an impermissible risk of suppression of ideas.

Id. at 1080 (internal citations omitted).

The Lewis Court also explained that in order for the plaintiff to succeed in her challenge to the "contrary to public policy" provision of the statute, she need not show that she was denied her requested license plate because of her viewpoint. "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." Id. To prevail, "Ms. Lewis, therefore, need show only that there was nothing in the ordinance to prevent the DOR from denying her the plate because of her viewpoint." Id.

The Supreme Court has consistently held that the mere fact that a state agent *may* exercise his or her discretion in a reasonable manner will not act to save an ordinance which vests excessively broad discretion to the agent to regulate speech. In Lakewood, the Court invalidated a city ordinance which authorized the mayor to grant or deny applications for annual permits to place news racks on public property. If the mayor denied an application, he was required to state the reasons for the denial. If an application was granted, the mayor could place any terms and conditions he deemed necessary and reasonable. The Court held that a facial challenge could be brought "whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." Id. at 759. In striking down this ordinance, the Court

noted that the absence in the ordinance of explicit limits on the mayor's discretion created an impermissible degree of discretion:

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes that the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well established practice. This Court will not write nonbinding limits into a silent statute.
>
> . . . .
>
> We hold those portions of the Lakewood ordinance giving the mayor unfettered discretion to deny a permit application and unbounded authority to condition the permit on any additional terms he deems "necessary and reasonable," to be unconstitutional.

Id. at 770, 772 (internal citations omitted).

Whether the Douglas County Treasurer's offices are viewed as limited designated fora or nonpublic fora, the Restricted Access Policy vests unbridled, standardless discretion to governmental agents or officials to determine when, if and under what circumstances petitioners will be allowed to gather signatures at these locations. Because the policy contains no standards or objective criteria upon which the official must base his or her decision, the Restricted Access Policy violates the First Amendment.

### E. Even in Limited Designated Public Fora or Nonpublic Fora, Defendants' Restrictions on Core Political Speech must Be Reasonable.

"Restrictions on speech not within the type of expression allowed in a limited public forum must . . . be reasonable and viewpoint neutral." Bowman, 444 F.3d at 976.[12] To

---

[12] According to the court's opinion in Bowman, the restrictions on speech which may be imposed in a limited designated public forum are virtually identical to the restrictions which may be imposed on speech in a non-public forum. "[I]n a limited designated public forum,

determine whether a restriction on speech in a limited designated forum is reasonable, the court must consider the speech being restricted and whether that speech is essentially incompatible with the normal activity of the forum. Here, petition circulators wish to engage in core political speech seeking a constitutional amendment to cap governmental spending. Though Nebraska residents are otherwise free to come by a county treasurer's office to voice concerns about property tax increases, a Nebraska resident seeking to enact legislative change to the government's spending structure is denied access to the very same office. Similarly, one would presume that if a group of citizens engaged a lobbyist to convince the county treasurer to lower the tax levy, the lobbyist would be free to address this issue with the treasurer or the treasurer's agents at the county treasurer's office. Again, though, if citizens sought to change the tax levy through the initiative process, those citizens would be denied access to the very same property despite the similar purpose of their requested access.

In order for the government to support such a ban on political speech, the government must show that the proposed expression "is basically incompatible with the normal activity of [the] particular place at [the] particular time." Jacobsen v. Howard, 109 F.3d 1268, 1274 (8th Cir. 1997) (quoting Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)). "Public property . . . which is neither a traditional nor a designated public forum, can still serve as a forum for First Amendment expression if the expression is appropriate for the property and is not incompatible with the normal activity of a particular place at a particular time." Jacobsen, 109 F.3d at 1273 (quoting Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth., 745 F.2d 767, 773

---

'restrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral.'" Bowman, 444 F.3d at 976. "In a nonpublic forum, the government may restrict speech 'as long as the restrictions are reasonable and are not an effort to suppress expression merely because the public officials oppose a speaker's view.'" Id.

(2d Cir.1984)). In Jacobsen, the court determined that even though highway rest areas were nonpublic fora, the state could not ban the commercial distribution of newspapers at rest areas because this activity was not incompatible with the normal use and purpose of rest stops, thus such a restriction was not reasonable.

> The state has presented no credible explanation why the distribution of newspapers at an interstate rest area is incompatible with the state's interests in providing places of safety, rest, and information to interstate travelers.
>
> . . .
>
> We have no hesitation in deciding that the distribution of newspapers at an interstate rest area is fully compatible with the state's interests in providing safety, rest, and information to interstate travelers.

Jacobsen, 109 F.3d at 1274.

In this litigation, petition circulators seek access to the exterior grounds of the Douglas County treasurer's offices to engage in speech related to the function and business of government taxation and spending. Just as the Jacobsen court held that the distribution of newspapers was not incompatible with the state's interest in providing safety, rest and information to travelers, the petitioners desire to engage in core political speech on matters of legislative change is not incompatible with the function of public governmental offices.

The compatibility of the petition circulators' intended use is even more pronounced in this case because petition circulators seek access to the governmental property for a legitimate governmental purpose. The government property at issue is the home of the county treasurer's offices where political decisions are made concerning tax rates and the manner in which the government raises revenue. Petition circulators seek to enact legislation that would address the manner and amount of public funds the government may lawfully spend. Both the county treasurer and the petition circulators are engaged in important aspects of government business

that affect the funding of governmental entities. The county treasurer's efforts to remove petition circulators from the public areas around her offices denigrates Nebraska citizens' constitutional right to act as a separate but equal legislative body as compared to other branches of Nebraska state and local government. Existing governmental entities must "respect and . . . give effect to the power the people have reserved to themselves to amend the Nebraska Constitution through initiative measures." Duggan, 249 Neb. at 421, 544 N.W.2d at 75.

It is doubtful that a county treasurer would deny access to a legislative committee of the Unicameral charged with exploring property tax valuations and tax rates in the State of Nebraska for the purpose of enacting legislation, yet the Douglas County Treasurer seeks to deny access to petition circulators who are engaged in a similar political role. Consistent with the First Amendment, public properties like the county treasurer's office are open for citizen access to engage in discussions concerning government business. Therefore, when citizens seek to fulfill their state constitutional right to engage in the initiative petition process, the petitioning citizens have an equal right of access to this type of property under the First Amendment.

However, even if this Court were to determine that the petition circulators' speech was incompatible with the type of expressive activity generally allowed at these govenmental facilities, the government's ban on this speech must still be reasonable. In Initiative and Referendum Institute v. United States Postal Service, 417 F.3d 1299 (D.C. Cir. 2005), the Court of Appeals for the District of Columbia Circuit determined that a wholesale ban on soliciting signatures for initiative petitions on postal service property was unreasonable even if this property was deemed a nonpublic forum. The court reached this result, in part, because the postal service ban - like Omaha's Restricted Access Policy - would conceivably even reach requests for postal patrons to sign the petition off postal service premises. Id. at 1314.

> It is clear that a broadscale prohibition against asking postal patrons to sign petitions at other locations, whether such requests are made verbally or in distributed pamphlets, is unconstitutional even if all postal properties are nonpublic forums. Although restrictions on speech in such forums are permissible, they still must be "reasonable." The Supreme Court has repeatedly held absolute bans on pamphleteering and canvassing invalid, whether applied to nonpublic governmental forums or to private property, because of their substantial overbreadth.

Id. at 1315 (internal citations and footnotes omitted). Accordingly, the court found that none of the proposed governmental interests could reasonably justify an across the board prohibition on soliciting petition signatures. Id.

The Restricted Access Policy requires petition circulators to obtain government permission prior to seeking to "obtain signatures" on government property. Like the policy rejected in IRI, this broad language would conceivably apply to even verbal requests to sign the petition off of the county treasurer's premises, and like the postal service's policy - the Restricted Access Policy is so substantially overbroad that it violates the First Amendment even in nonpublic fora.

## IV. THE PUBLIC INTEREST SUPPORTS THE ISSUANCE OF AN INJUNCTION.

There can be no legitimate public interest served by suppressing constitutionally protected conduct. The avoidance of constitutional harm is, of itself, a significant societal good. See, Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 2001 WL 15333 at *35 (citing Edwards J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council, 485 U.S. 568, 575 (1988)).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs request that this Court enter a temporary restraining order enjoining Defendants and their agents from engaging in the violation of Plaintiffs' First Amendment rights.

Respectfully submitted this 26th day of June, 2006.

MIKE GROENE, individually and as Chair of the Stop Overspending Nebraska Ballot Committee; ROBERT COLE ROGERS, and AMIE SPRADLEY,
Plaintiffs

BY:    OGBORN SUMMERLIN & OGBORN PC
        GENE SUMMERLIN - 19611
        MARNIE JENSEN - 22380
        210 Windsor Place
        330 South 10th Street
        Lincoln, NE 68508
        (402) 434-8040
        gene@osolaw.com
        marnie@osolaw.com

            AND

BY:    MAYER, BROWN, ROWE & MAW LLP
        EUGENE VOLOKH - pro hac vice pending
        [mailing address only]
        UCLA School of Law
        405 Hilgard Ave.
        Los Angeles, CA 90095
        (310) 206-3926
        volokh@law.ucla.edu

BY:  /s/Gene Summerlin